UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Comcast of Massachusetts I, Inc.** ) | Case No.: 1:04-cv-11844-REK |
| ) | |
| Plaintiff, ) | **AFFIDAVIT OF** |
| ) | **MICHAEL WOOD** |
| vs. ) | |
| ) | |
| **William Antos** ) | |
| ) | |
| Defendant ) | |
| ) | |
| ) | |

Now comes the affiant, and makes this his sworn statement, under the pains and penalties of perjury, of his own personal knowledge.

1. My name is Michael Wood.

*Training, Qualifications*

2. I am employed by Comcast Cable Communications as a Security Investigator. I was also employed by Comcast's corporate predecessor in a similar position.

3. Comcast is the successor corporation to AT&T Broadband. For the purposes of simplicity I will refer to Plaintiff as "Comcast", even if at the reference point in time the cable television company was then called AT&T Broadband.

4. Through on-the-job training and years of experience, I have become familiar with the technology utilized by Comcast and with associated black market technology. Specifically, I have become familiar with:

   a. Analog scrambling and descrambling technology,

   b. Related cable hardware technology;

   c. Black market descrambling technology.

   d. The methodology of testing descrambling devices to determine if such devices have been covertly modified to receive unauthorized interception of signals.

Page 1

5. I have examined many black market cable television descrambling devices and many Comcast issued converters/descramblers that have been covertly modified to receive unauthorized interception of signals.

6. I have been trained and I am familiar with the testing of cable television devices to determine if the devices have the ability to descramble scrambled analog signals without the authorization of the cable television company.

***Comcast's System and Piracy***

7. In order to protect its signals and maintain the value of its services, Comcast, at all times pertinent to this case, encrypted and/or scrambled, in an analog fashion, some of its signals such that those channels would first have to have been decoded by addressable electronic decoding equipment in order to be viewed clearly on a television receiver.

8. Comcast utilized analog encryption to encrypt and/or scramble signals for:

   a. Premium channels, such as HBO, Showtime, and Cinemax; for which subscribers would have paid a separate monthly subscription fee; and

   b. Pay-per-view events, such as a specific movie, concert or sporting events, for which subscribers would have paid a specific one time charge to view each event.

9. Comcast issued/leased analog devices called "addressable converters/descramblers" to most of its subscribers. These devices converted signals for older televisions that were not "cable ready" and, more significantly, they descrambled analog signals based upon the instructions that Comcast sent to the addressable converter/descrambler. The crucial element of the addressable converter/descrambler was that it was "*addressable*". That meant Comcast could "address" the descrambler. "Addressability" refers to the descrambler's ability to descramble signals based *only* upon the instructions that it receives from the cable company.

10. Certain devices, commonly known as and hereinafter refer to as "black boxes" are unauthorized, **non-addressable** descrambling devices. A black box is not an *addressable* converter/descrambler. Rather, it is a *non-addressable* descrambler that is specifically designed to ignore or refuse to accept any instructions from the cable television company as to what signals to descramble.

11. Black boxes were designed to descramble all scrambled stations, all premium stations, all pay-per-view movies and all pay-per-view events 24 hours a day, seven days a week regardless of any instructions from the cable company. There is no legitimate use for such a device.

12. Take note of the fact that an individual in possession of an unauthorized non-addressable descrambling device would still need to purchase some cable television signals from Comcast in order to allow the scrambled signals to enter the home and thereafter be covertly descrambled.

13. Take note of the fact that an unauthorized non-addressable descrambling device simply descrambles the scrambled analog channels that are in the individual's home

without authorization; it does not pull in the non-scrambled stations from the telephone pole. The non-premium cable television stations (e.g. MTV, The History Channel, etc.) are offered to subscribers in groupings of channels ("tiers"). These channels are either delivered in groups to the subscriber in a non-scrambled fashion or they are simply not delivered into the home at all. This explains why an individual with an unauthorized non-addressable descrambling device might still be paying a significant amount to the cable television company while utilizing a descrambler to descramble the premium channels. If an individual with an unauthorized non-addressable descrambling device wanted access to *all* stations, that individual would still have to pay to have all the non-scrambled stations to come into the home. The individual could then use the unauthorized non-addressable descrambling device to descramble the premium stations and pay-per-view signals.

### The Defendant

14. I am familiar with the business records of Comcast associated with the Defendant, William Antos.

15. On and before August 29, 2001 the Defendant had an account with Comcast where he was purchasing only non-premium programming.

16. On or about August 29, 2001 I went to the home of the Defendant, 120 Hamden Circle, Hyannis, Massachusetts, to investigate the fact that in March of 2000 Comcast had received an anonymous tip that the Defendant was using a black box.

17. At the home I was met at the door by a female who identified herself as the Mr. Anto's roommate. She went out the back door of the house and a man identifying himself as William Antos, the Defendant, approached me from around the back of the house.

18. I identified myself to Mr. Antos. I told him we had information that he was using black box. In fact, from where I was standing I could literally see a black box attached to a television set in his home. I asked him if this was reliable information and he said "no doubt".

19. The Defendant then voluntarily surrendered black box in question to me. Before I removed the box from his home, I tested the box and found it was receiving the premium channels and pay-per-view channels.

20. Thereafter, I took the subject device to a Comcast facility where I did a more detailed examination of the device and I determined that it was a working black box.

21. I was not able to determine when, specifically, the Defendant obtained and/or purchased the black box but take note of the fact that our records show that:

   a. Comcast received an anonymous tip the defendant was using a black box in March of 2000; and

   b. On May 17, 1999 the Defendant returned a Comcast-issued descrambler that was in his account but he never asked for a replacement for this descrambler. A black box could clearly be a replacement for a Comcast-issued descrambler.

22. Based upon these facts, the period of time from May 17, 1999 to August 29, 2001 would appear to be a significant, relevant period of time. I will refer to this 27 month period as the "pertinent period of time".

23. Significantly, the account history reveals that the Defendant did not order any premium channels or pay-per-view offerings during the pertinent period of time. This Defendant's account history also reveals that the Defendant did purchase non-premium stations during the pertinent period of time

24. An account history that evidences no purchases of premium channels and no purchases of pay-per-view offerings is consistent with the covert use of an unauthorized non-addressable descrambling device. It should also be realized that an account history that evidences the subject individual paying for non-premium cable television channels is also is consistent with the covert use of a descrambling device.

*Damages*

25. During the pertinent period of time, charges and offerings varied significantly but taking into account the length of time, the variations in price, and variations in offerings, it is reasonable to state that the Defendant, through the use of the device, would have had access to all of the:

    a. Premium channels with an *approximate on average* price of $65.00 per month. This $65.00 figure represents the value of the premium channels the Defendant had access to over and above the non premium stations he was actually paying for.

    b. Pay per view movie offerings with an *approximate on average* price of $3.95 per movie. There were numerous movies offered per month.

    c. Adult pay per view movie offerings with an *approximate on average* price of $8.00 per movie. There were numerous Adult movies offered per month

    d. Special event pay per view offerings (e.g.; boxing or wrestling match) with an *approximate on average* price of $30.00 per special event. On average there was at least one special event per month.

26. Also of assistance in calculating the amount of unauthorized interception is the fact that Comcast did a detailed analysis of its legitimate, paying subscribers in a similar New England franchise as to their pay-per-view purchasing in the month of February, 2003. This analysis showed that a statistically significant number (.17%) of its legitimate, paying, high-end purchasers purchased fourteen (14) or more pay-per-view movies during that particular month, an average cost of $55.30 per month.

Subscribed and sworn to, under the pains and penalties of perjury, this 20th day of February 2006.

*Michael R. Wood*
Michael Wood